**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                         )
COREY McFADDEN,                          )
                                         )
            Plaintiff,                   )
                                         )
      v.                                 )        Civil Action No. 12-940 (RBW)
                                         )
WASHINGTON METROPOLITAN                  )
AREA TRANSIT AUTHORITY, <u>et al.</u>,   )
                                         )
            Defendants.                  )
_____)

<u>**MEMORANDUM OPINION**</u>

The plaintiff, Corey McFadden, proceeding <u>pro se</u>, brings this action against his former employer, the Washington Metropolitan Area Transit Authority ("WMATA"), and three WMATA employees, Lisa Cooper Lucas, Ron A. Kelley, and John Coleman (the "individual defendants"), asserting claims for disability discrimination, retaliation, defamation, and civil conspiracy.  <u>See</u> Plaintiff's First Amended Complaint ("Am. Compl.") ¶¶ 175-243.  Currently before the Court are the Defendants' Motion for Summary Judgment ("Defs.' Mot."); the Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Cross-Motion for Summary Jud[g]ment ("Pl.'s Opp'n and Mot."); the Plaintiff's Motion to Strike the defendants' memorandum in support of their motion for summary judgment and his Motion for Sanctions ("Pl.'s. 1st Mot.); and the Plaintiff's Motion to Strike certain transcripts from the record and his Motion for Sanctions ("Pl.'s. 2nd Mot.).  Upon careful consideration of the parties' submissions, the Court concludes for the following reasons that the plaintiff's motions to strike must be

denied; the defendants' motion for summary judgment must be granted in part and denied in part; and the plaintiff's cross-motion for summary judgment must be denied.[1]

## I. BACKGROUND

Much of the factual background of this case has been previously set forth by the Court, see Order at 2 (Jan. 16, 2015), ECF No. 60; see also McFadden v. Wash. Metro Area Transit Auth., 949 F. Supp. 2d 214, 218-19, 225 (D.D.C. 2013), and the amended complaint contains the following allegations pertinent to the defendants' motion. WMATA hired the plaintiff as a bus mechanic in October 2008. Am. Compl. ¶ 11. In June 2009, the plaintiff was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and prescribed the drug Adderall "to increase his focus and concentration." Id. ¶¶ 16-17. Pursuant to a WMATA policy forbidding employees in "safety-sensitive positions" from using amphetamines, the defendants prohibited the plaintiff from working as a bus mechanic while taking Adderall, and suspended his employment after he tested positive for use of the drug. See id. ¶¶ 33-40, 65-90. Subsequently, at a grievance hearing before WMATA's Joint Labor Management Committee in March 2011, the individual defendants made statements, prior to the plaintiff's arrival at the hearing, indicating that the plaintiff was a drug addict who was abusing Adderall. See id. ¶¶ 72-74. WMATA later fired the plaintiff for violating the authority's substance abuse policy, but then

[1] In addition to those filings already identified, the Court considered the following filings in rendering its decision: (1) the Defendants' Memorandum of Points and Authorities in Support of their Motion for Summary Judgment ("Defs.' Mem."); (2) the Plaintiff's Reply in Opposition to Defendants' Memorandum of Points and Authority and Memorandum in Support of [Plaintiff's] Cross-Motion for Summary Judgment ("Pl.'s Opp'n"); (3) the Defendants' Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment ("Defs.' Reply"); (4) the Defendants' Opposition to the Plaintiff's [First] Motion to Strike and For Sanctions ("Defs.' 1st Opp'n"); (5) the Plaintiff's Reply to Defendants' Opposition to Plaintiff's [First] Motion to Strike and for Sanctions ("Defs.' Reply to Pl.'s 1st Mot."); and (6) the Defendants' Opposition to Plaintiff's [Second] Motion to Strike and for Sanctions ("Defs.' 2nd Opp'n").

reinstated his employment pursuant to an agreement with the Amalgamated Transit Union, Local 689, of which the plaintiff was a member.  Id. ¶¶ 75, 77, 16.

On June 8, 2012, the plaintiff instituted this action, asserting multiple claims against all defendants under the Rehabilitation Act of 1973, 29 U.S.C. § 701 (2012), and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12102(2)(B) (2012), as well as a defamation claim against the individual defendants.  See Order at 2 (Jan. 16, 2015), ECF No. 60.  The Court earlier dismissed the ADA claims against WMATA on the basis of sovereign immunity afforded WMATA under the Eleventh Amendment, and the ADA and the Rehabilitation Act claims against the individual defendants on the basis that there is no individual liability under either statute.  McFadden, 949 F. Supp. 2d at 219-20, 225.  Accordingly, only the plaintiff's Rehabilitation Act claims against WMATA and the defamation claim against the individual defendants remained alive.  See id. at 225.

Following the issuance of the Court's dismissal ruling, the plaintiff sought leave to file an amended complaint to add an additional defendant, Dr. Desmond Johnson ("Dr. Johnson"), and claims of both intentional infliction of emotional distress and civil conspiracy based on the underlying tort of intentional infliction of emotional distress against the individual defendants and proposed defendant Dr. Johnson.  See Order at 5 (Apr. 11, 2014), ECF No. 38.  The Court denied the plaintiff's motion in its entirety, finding that "allowing the plaintiff leave to amend his complaint . . . would be futile," id. at 6, because the plaintiff relied wholly on "allegations of intra-workplace conduct," id.; see also Kassem v. Wash. Hosp. Ctr., 513 F.3d 251, 256 (D.C. Cir. 2008) (holding that the plaintiff stated facts sufficient to withstand the dismissal of his intentional infliction of emotional distress claim because he "does not merely plead intra-

workplace mistreatment" but also pleads facts that suggest that his employer's actions have "subjected him to criminal penalties"), which are insufficient to sustain a claim of intentional infliction of emotional distress, and because the plaintiff based his conspiracy claim on the tort of intentional infliction of emotional distress, the conspiracy claim also failed as a matter of law due to the legal requirement that a viable underlying tortious act be a condition precedent to the sustainability of a civil conspiracy claim.  See Order at 3 (Jan. 16, 2015), ECF No. 60.

Notwithstanding the Court's reasoning in its April 11, 2014 Order, the plaintiff again moved to file an amended complaint to once again add Dr. Johnson as an individual defendant and to include and reassert claims of (1) negligent infliction of emotional distress against Dr. Johnson; (2) intentional infliction of emotional distress against Dr. Johnson and the other individual defendants; and (3) a civil conspiracy claim based on the torts of defamation, negligent infliction of emotional distress, and intentional infliction of emotional distress.  See Order at 4 (Jan. 16, 2015), ECF No. 60.  In partially denying and granting the plaintiff's second motion to amend, the Court concluded that allowing the plaintiff to amend the complaint to add Dr. Johnson as an individual defendant would cause "[t]he legal landscape of this action . . . [to] expand and become more complex, resulting in both undue delay and prejudice to the defendants" and "would essentially create a case within a case" and re-start the litigation from the beginning.  Id. at 7-8.  The Court also precluded the plaintiff from asserting a claim of negligent infliction of emotional distress against either Dr. Johnson because the plaintiff had "knowledge of the allegations that purportedly support his claim against Dr. Johnson for nearly two years, and [did not] argu[e] that only through discovery did the facts come to light that support the claim," id. at 7, or the individual defendants because the plaintiff's allegations "only

4

theoretically implicate potential criminal repercussions from the defendants' actions based on conduct that has never actually occurred," id. at 9.

The Court further denied the plaintiff's second motion to amend the complaint to include a civil conspiracy claim based on the torts of negligent infliction of emotional distress and intentional infliction of emotional distress, as the Court previously dismissed those claims, prohibiting the survival of the civil conspiracy claims predicated on these torts. Id. at 10. The Court, however, "in light of the record currently before the Court," id., did grant the plaintiff's motion to amend the complaint to include a civil conspiracy claim based on the tort of defamation because "the defendants will experience little prejudice, if any, as [the civil conspiracy] claim only spreads liability among the alleged wrongdoers for the underlying tort and will not necessarily require additional discovery that has not already been taken by the parties," id. at 10-11.

The defendants have now moved for summary judgment on all counts, which the plaintiff simultaneously opposes and cross moves for summary judgment.

## II. STANDARDS OF REVIEW

### A.  Motions to Strike

Motions to strike are "drastic remed[ies] that courts disfavor," Riddick v. Holland, 134 F. Supp. 3d 281, 285 (D.D.C. 2015) (citation omitted), and the trial judge has discretion to either grant or deny the motion, see id.  A court, either on its own volition or by a moving party, may strike from a pleading[2] any "insufficient defense or any redundant, immaterial, impertinent or scandalous matter."  Fed. R. Civ. P. 12(f).  Rule 12(f) itself does not require the striking of

---

[2] A "pleading" includes a complaint, an answer, an answer to a counterclaim, an answer to a cross-claim, a third-party complaint, and a third-party answer.  Fed. R. Civ. P. 7(a).

prejudicial matters, and although courts disfavor motions to strike, courts have granted such motions, but only upon a showing that parts of a pleading are prejudicial or scandalous. Therefore, "absent a 'strong reason for so doing,' courts will generally 'not tamper with pleadings.'" Nwachukwu v. Rooney, 362 F. Supp. 2d 183, 190 (D.D.C. 2005) (quoting Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)).

### B.  Motions for Summary Judgment

Courts will grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Steele v. Schafer, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255 (citation omitted).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment . . . ." Id.  The movant has the burden of demonstrating the absence of a genuine issue of material fact and that the non-moving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In responding to the summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (citing cases).  Accordingly, the non-moving party must not rely on "mere allegations or denials . . . but must set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson, 477 U.S. at 248 (one ellipsis omitted) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 288 (1968)).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position [is] insufficient" to withstand a motion for summary judgment, as "there must be [some] evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.  Finally, courts must afford a pro se plaintiff liberal construction of his summary judgment submissions, affording him "the benefit of the doubt," and "may ignore some technical shortcomings of their filings." Sindram v. Kelly, No. 06-cv-1952 (RBW), 2008 WL 3523161, at *3 (D.D.C. Aug. 13, 2008) (Walton, J.) (quoting Voinche v. FBI, 412 F. Supp. 2d 60, 70 (D.D.C. 2006)); see also Richardson v. United States, 193 F.3d 545, 548 (D.C. Cir. 1999).

### III. LEGAL ANALYSIS

#### A.     The Plaintiff's Motions to Strike

The plaintiff requests that this Court strike from the record the defendants' Memorandum in Support of their Motion for Summary Judgment in its entirety because the memorandum is not signed as required by the rules of this Court.  See Pl.'s 1st Mot. at 1.  However, because motions to strike can be directed only at pleadings, see Fed. R. Civ. P. 7 (distinguishing pleadings from motions and other papers); see also Balcoh v. Norton, 517 F. Supp. 2d 345, 348 n.2 (D.D.C. 2007) (explaining that "a motion to strike . . . is limited to pleadings); Modaressi v. Vedadi, 441

F. Supp. 2d 51, 54 n.2 (D.D.C. 2006) (holding that "the plain language of Rule 12(f)" requires the court to deny the plaintiff's motion to strike the defendant's motion to dismiss); <u>Nwachukwu</u>, 362 F. Supp. 2d at 190 ("Because the defendants' reply memorandum is not a pleading, as defined in Federal Rule of Civil Procedure 7(a), and motions to strike only apply to pleadings, the plaintiff's motion to strike is improperly directed at the defendants' reply."), and because the plaintiff requests that the Court strikes the defendants' memorandum in support of its motion for summary judgment, which is not a pleading, the Court declines to grant the plaintiff's motion to strike the defendants' memorandum.

Additionally, the plaintiff requests that this Court sanction Mr. Stief as the Court officer who filed the unsigned memorandum. Pl.'s 1st Mot. at 1-2. In opposition, the defendants, albeit admitting to the "proofreading" oversight, respond that signing the "signature block" on the motion "serves the same purpose for the memorandum." <u>See</u> Defs.' 1st Opp'n at 2. Although the Court does not condone technical errors committed by attorneys, the defendants' position is correct because a "written instrument that is an exhibit to a [motion] is a part of the [motion] for all purposes." Fed. R. Civ. P. 10(c). Therefore, the Court denies the plaintiff's motion for sanctions.

The plaintiff also seeks to strike from the record the plaintiff's deposition transcript and errata sheets ("Deposition Materials"), which the defendants filed as an exhibit with their Reply to Plaintiff's Opposition to Defendants' Motion for Summary Judgment and Opposition to Plaintiff's Cross-Motion for Summary Judgment because they were filed "in violation of Rule 30 of the Federal Rules of Civil Procedure to prolong this civil action in an attempt to have both [of his] civil actions combined." Pl.'s 2nd Mot. at 1. More specifically, in his Notice of Objections,

which was part of the plaintiff's first motion to strike, the plaintiff "objected to the inclusion of fabricated, altered and un-finalized altered transcripts . . .[,] includ[ing] altered and un-finalized transcripts of [his] deposition." Pl.'s 1st Mot. at 1. The defendants respond that they filed a complete copy of the deposition materials with their reply to dispel the plaintiff's allegation of misuse by the defendants when they filed abbreviated portions of the deposition materials with their motion for summary judgment. Defs.' 2nd Opp'n at 2.

Rule 30 of the Federal Rules of Civil Procedure outlines the protocols for depositions by oral examination, see Fed. R. Civ. P. 30, but does not address whether an entire copy or an abbreviated portion of a deposition transcript must be included when the transcript is filed. See id. 30(f). In any event, because the plaintiff's deposition materials are relevant to the Court's summary judgment rulings, are not prejudicial to the plaintiff, and were filed on behalf of the defendants in good faith, the Court, in its discretion, denies the plaintiff's motion to strike the deposition materials from the record. See Nwachukwu, 362 F. Supp. 2d at 190 (holding that a motion to strike is for "redundant, immaterial, impertinent or scandalous matter," Fed. R. Civ. P. 12(f), and should not be used as "a vehicle to penalize parties and prevent the court from considering a party's motion."). Accordingly, there being no underlying violation of Rule 30, the Court also denies the plaintiff's second motion for sanctions.

**B.      The Plaintiff's Rehabilitation Act Claims Against WMATA**

WMATA moves for summary judgment on the plaintiff's disability discrimination and retaliation claims under the Rehabilitation Act on the grounds that they are, at least in substantial part, time-barred and that they fail on the merits. See Defs.' Mem. at 5-16. The Court will address each argument in turn.

1.      **Timeliness**

"Because the Rehabilitation Act does not specify its own limitations period, courts generally 'borrow one from an analogous state cause of action, provided that the state limitations period is not inconsistent with underlying federal policies.'"  Alexander v. Wash. Metro Area Transit Auth., __ F.3d. __, __, 2016 WL 3467416, at *5 (D.C. Cir. June 24, 2016) (quoting Spiegler v. District of Columbia, 866 F.2d 461, 463-64 (D.C. Cir. 1989)).  In general, "when a federal court borrows a limitations period from state law, that law's tolling provisions come along as part of the package . . . [because] 'the chronological length of the limitations period is interrelated with provisions regarding tolling.'"  Id. (quoting Johnson v. Ry. Express Agency, Inc., 421 U.S. 454, 464 (1975).  Accordingly, federal courts "should not unravel state limitations rules unless their full application would defeat the goals of the federal statute at issue."  Harden v. Straub, 490 U.S. 536, 539 (1989).

WMATA argues that the applicable statute of limitations is the one-year limitations period of the District of Columbia Human Rights Act, see Defs.' Mem at 5-6 (citing Jaiyeola v. District of Columbia, 40 A.3d 356, 362-68 (D.C. 2012) (Human Rights Act's "one-year statute of limitations governs § 504 claims in this jurisdiction")).  Although recognizing the disagreement by members of this Court as to whether an employee's pursuit of administrative remedies toll the statute of limitations, WMATA asserts that the plaintiff's filing of a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") "does not toll the running of the statute of limitations in Rehabilitation Act cases."  Id. at 7 (citing Johnson, 421 U.S. at 461).

However, the District of Columbia Circuit recently held in <u>Alexander</u> that under the Human Rights Act, "[t]he timely filing of a complaint with the [District of Columbia Office of Human Rights], or under the administrative procedures established by the Mayor...shall toll the running of the statute of limitations while the complaint is pending." <u>Alexander</u>, __ F.3d at __, 2016 WL 3467416, at *5 (citing D.C. CODE ANN § 2-1403.16(a)). More importantly, the EEOC and the Office of Human Rights maintain a work-sharing agreement, which provides that "the timely filing of a complaint with the EEOC" triggers this tolling provision. <u>Id.</u> (quoting <u>Jaiyeola</u>, 40 A.3d at 369).

In <u>Alexander</u>, the plaintiff filed a complaint alleging disability discrimination under the Rehabilitation Act based upon WMATA's refusal to rehire the plaintiff after completing an intensive alcohol dependency treatment program. <u>Id.</u> at *1-2. WMATA, as in this case, argued that the plaintiff's Rehabilitation Act claim was time barred because the complaint was filed more than a year after the adverse rehiring decisions and that the Supreme Court's decision in <u>Johnson</u> foreclosed the plaintiff's reliance on the tolling provision. <u>Id.</u> at *5 (citing 424 U.S. at 461, where the Court concluded that the limitations period for the plaintiff's § 1981 claim was not tolled by the plaintiff's pursuit of his Title VII claim before the EEOC). In distinguishing <u>Johnson</u>, the <u>Alexander</u> court reasoned that the claim the plaintiff exhausted through the administrative process in <u>Alexander</u> was "closely akin to [the plaintiff's] Rehabilitation Act claim" and that "District law mandates tolling." <u>Id.</u> at *6. ("[T]he relevant state statute of limitation in <u>Johnson</u> did not have any tolling provision, and so the Court deferred to the State's judgment 'in setting a limit, and exceptions thereto, on the prosecution of a closely analogous claim.'" (quoting <u>Johnson</u>, 421 U.S. at 464)). And, the <u>Alexander</u> court further explained that

the Human Rights Act does not "limit tolling to mandatory exhaustion," but is generally applicable to "any time period 'while [an administrative] complaint is pending.'" <u>Id.</u> Consequently, the court held that the plaintiff's complaint was timely filed.

In this case, the plaintiff's Rehabilitation Act claims are not time-barred, having been filed within the one year limitations period provided by the District of Columbia Human Rights Act. The allegations that the plaintiff asserts commenced on or about June 10, 2010, and to seek relief based on all of these allegations, the plaintiff was required, absent any intervening events, to file his complaint by June 10, 2011, pursuant to the one year limitations period provided by the Human Rights Act. However, because the plaintiff filed a timely Charge of Discrimination with the EEOC on January 21, 2011, <u>see</u> Defs.' Mem., ECF No. 78-7, Exhibit ("Ex.") Attachment 1 (Charge of Discrimination)[3], the limitations period was tolled, as mandated by the Human Rights Act, and the running of the limitations period did not resume until March 17, 2012, the day after the EEOC issued the plaintiff a right-to-sue notice, leaving the plaintiff with approximately 5 months to timely file his complaint by August 10, 2012. Having filed this action on June 8, 2012, the plaintiff timely filed the action within the limitations period. Accordingly, the Court declines to grant the defendants' motion for summary judgment on the plaintiff's Rehabilitation Act claims against WMATA on the grounds that the claims are, in substantial part, time-barred.

### 2.    The Merits of the Plaintiff's Rehabilitation Act Claims

Alternatively, WMATA argues that even if timely, the plaintiff's disability discrimination and retaliation claims pursuant to the Rehabilitation Act fail on the merits. The Rehabilitation

---

[3] In referencing the parties' exhibits, the Court will use the assigned electronic court filing ("ECF") page numbers for pincites.

Act expressly prohibits discrimination against an "otherwise qualified individual with a disability . . . solely by reason of his disability."  29 U.S.C. § 794(a) (2014).  And, it also prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter."  42 U.S.C. § 12203(a).  The Court will address the merits of each claim in turn.

### a.  Disability Discrimination Claim

The plaintiff alleges disability discrimination against WMATA pursuant to the Rehabilitation Act based on his claim that WMATA failed to provide him with a reasonable accommodation for his disability.  See Am. Compl. ¶¶ 175-192.  Discrimination claims under the Rehabilitation Act are governed by the legal standards for employment discrimination claims brought under the ADA.  29 U.S.C. § 794(a).  Under the ADA, discrimination includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship on the [employer's] operation of [its] business."  42 U.S.C. § 12112(b)(5)(A) (2009); see also 29 C.F.R. § 1614.203(c)(1) (2016).

In this Circuit, failure to provide reasonable accommodation claims are not subject to the rigorous analysis mandated by the McDonnell-Douglass burden-shifting framework.  Id.; see also Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1288 (D.C. Cir. 1998) ("We then consider [the plaintiff's] reasonable accommodation claim, which is not subject to analysis under the

McDonnell-Douglas, but has its own specialized legal standards.").[4]  Rather, to survive summary

judgment, a plaintiff must establish a prima facie case of discrimination under the Rehabilitation

Act for failure to provide reasonable accommodations by producing

> evidence from which a reasonable fact-finder could find that (1) he had a qualifying
> disability within the meaning of the statute, (2) his employer had notice of his
> disability, (3) with reasonable accommodation, he could perform the essential
> function of the position, and (4) he requested an accommodation but the employer
> denied his request.

 Doak v. Johnson, 19 F. Supp. 3d 259, 273 (D.D.C 2014).

     WMATA does not dispute that the plaintiff is an individual with a disability and that it

had notice of his disability.  See generally Defs.' Mem. at 9-16.  Thus, WMATA does not contest

that the plaintiff has established the first two elements of his prima facie case for his failure to

accommodate claim.  What WMATA takes issue with are the third and fourth elements of the

plaintiff's prima facie case, arguing that the plaintiff was not a qualified individual with a

disability who with or without accommodations could perform the essential functions of his job,

see id. at 9-10, and that it "made a good faith and successful effort to accommodate the

plaintiff's disability," id. at 10.

     To establish the third element of his prima facie case, the plaintiff must demonstrate that

he is a qualified individual, which under the Rehabilitation Act, is "an individual with a

disability who, with or without reasonable accommodation, can perform the essential functions

of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8); see

---

[4] In its Memorandum of Support for its motion for summary judgment, WMATA incorrectly applies the three part,
burden-shifting framework established by McDonnell-Douglass to the plaintiff's disability discrimination claim for
failure to provide a reasonable accommodation.  Because the District of Columbia Circuit has made clear that it is
not appropriate to apply this framework to a failure to accommodate claim, the Court will not consider WMATA's
extensive discussion of this framework in its attempt to demonstrate why the plaintiff's Rehabilitation Act disability
discrimination claim fails on the merits.

<u>also</u> 29 C.F.R. § 1614.203(a)(6).  Thus, if the individual with a disability can perform the essential functions of his position with reasonable accommodations, he is deemed to be "qualified."  <u>See</u> <u>Graffius v. Shinseki</u>, 672 F. Supp. 2d 119, 126 (D.D.C. 2009) (citing <u>Carr v. Reno</u>, 23 F.3d 525 (D.C. Cir. 1994)).  "An accommodation is 'reasonable' if it allows the employee to fulfill all essential functions of h[is] job without imposing an undue hardship on [his] employer."  <u>Id.</u> (citing 29 C.F.R. § 1614.203(c)(1)).  The employee bears the burden of identifying a reasonable accommodation, and the employer likewise bears the burden of proving undue hardship.  <u>Id.</u>  In this case, the plaintiff sought to use Adderall, an amphetamine prescribed by his physician, to manage the symptoms associated with his mental impairment and "increase his focus and concentration."  Am. Compl. ¶ 17.  WMATA denied the plaintiff's request based on purported federal regulations and safety related considerations.  <u>Id.</u> ¶¶ 34-37, 71-73.

For several reasons, there is a genuine dispute of material fact as to whether the plaintiff, with the use of Adderall as a reasonable accommodation, could perform the essential functions of his position as a bus mechanic for WMATA.  First, WMATA asserts that, pursuant to federal regulations, the plaintiff is not qualified for the position of bus mechanic because of his "use of Adderall" and his failure to provide WMATA "the requisite certification that the doctor who prescribed him Adderall was familiar with his assigned duties."  Defs.' Mem. at 15.  WMATA bus mechanics are tasked, among other responsibilities, with repairing, servicing, and operating transit authority's buses.[5]  <u>See id.</u> at 12.  To perform these essential functions, a bus mechanic must have a commercial driver's license, <u>see</u> Am. Compl. ¶ 13, to operate commercial motor

---

[5] Federal regulations address the repairing and maintenance of commercial motor vehicles, <u>see</u> 49 C.F.R. § 396, but these regulations do not address the physical qualifications or physical restrictions that cover individuals who service or repair such vehicles.

vehicles, such as WMATA's buses.  And, federal regulations provide safety guidelines that

govern the physical qualifications of individuals seeking to operate commercial motor vehicles.

49 C.F.R. § 391.11(a) (2015).  Under these regulations, such individuals are prohibited from

using certain controlled substances, such as the Schedule II drug Adderall, unless a licensed

medical practitioner, who is familiar with the individual's medical history, prescribes the use and

properly advises the individual that the use will not adversely affect the individual's ability to

operate a commercial motor vehicle.  Id. § 391.41(b)(12).  If the licensed medical practitioner

finds the individual physically qualified, he must complete a certification and provide a copy to

the individual.  Id. § 391.43(g)(2).  WMATA adheres to these federal regulations and has not

implemented an internal policy that further adds to the federal regulations by prohibiting the use

of a controlled substance like Adderall by its employees in safety-sensitive positions such as bus

mechanics.  See Defs.' Mem., ECF No. 78-6, Ex. A (Memorandum entitled "Cory McFadden-

Amended Resp. dated March 30, 2011) ("March 30, 2011 Mem.") at 1-2.  Thus, the plaintiff is

qualified for the position of bus mechanic while using Adderall if his licensed medical physician

prescribes the use and completes the requisite certification.

　　　But, WMATA, relying on the affidavit of defendant Cooper-Lucas, claims that the

plaintiff never provided the requisite certification from his prescribing physician for his use of

Adderall while on duty as a bus mechanic.  And contrary to the plaintiff's assertion that federal

law does not require such certification, see Pl.'s Opp'n at 9, the plaintiff's prescribing physician

must provide such a certification to "the employing motor carrier who requests it."  49 C.F.R. §

391.43(g)(2)(i).  The record, however, does not reflect that WMATA actually made a request for

the certification; rather, the record shows that on June 10, 2010, WMATA asked the plaintiff to

"have your physician evaluate your medical regimen [because] as a [commercial driver license]

holder you're not permitted under DOT regulations to use Adderall" and to "provide the results

to WMATA's Medical Office."  Pl.'s Opp'n, ECF No. 84-15, Ex. 48 (WMATA Medical

Services & Compliance Branch Fitness for Duty Examination Form dated June 10, 2010).  The

plaintiff was provided "a referral form to take to his physician with much of the same

instruction" and was "held off from work until [WMATA's Medical Office] had a response from

his physician."  See id., ECF No. 84-34, Ex. 85 (Memorandum dated August 23, 2010 re

Grievance Case 010430) ("August 23 Mem.").  This plausibly suggests that WMATA was only

instructing the plaintiff not to use Adderall and for the plaintiff to ask his physician for an

alternative medication.  The plaintiff seemingly complied with what he thought he was told to

do, as he subsequently supplied WMATA with an alternative prescription.  See id., ECF No. 84-

34, Ex. 85 (August 23, 2010 Mem.) (noting that when WMATA's Medical Office saw the

plaintiff six days later, the plaintiff "stated that his primary care physician had discontinued the

Adderal [sic] and started him on Strattera" and the plaintiff was "cleared [to] return to regular

duties"); see also id., ECF No. 84-42, Ex. 102 (Prescription Reporting Form dated June 18,

2010).  WMATA's request cannot definitively be construed as an instruction for the plaintiff to

provide WMATA with a copy of the requisite certification completed by his physician indicating

that he is familiar with the plaintiff's medical history and has properly advised him that using

Adderall will not adversely affect his ability to operate a commercial motor vehicle.  But, even if

the record supported this interpretation, WMATA expressly states that "[t]here is no dispute that

WMATA initially allowed [the p]laintiff to continue to work as a bus mechanic based on his

treating doctor's certification regarding the use of Adderall."  Defs.' Mem. at 10.  Because

17

WMATA did not have a policy prohibiting the use of Adderall by its employees in safety
sensitive positions such as bus mechanics and federal regulations do not prohibit the use of
Adderall by individuals operating a commercial motor vehicle provided that the prescribing
physician provides the requisite certification, which WMATA affirms they received, WMATA's
argument, that the plaintiff cannot perform the essential functions of the bus mechanic position
because he is not qualified for the position due to his use of Adderall and his failure to provide
the requisite certification from his prescribing physician that the plaintiff was advised that such
use will not adversely affect his ability to operate a commercial motor vehicle does not entitle
WMATA to summary judgment.

WMATA next argues that the "plaintiff had significant safety-related issues regardless of
whether or not he was on Adderall," id. at 12, therefore showing that the plaintiff could not
perform the essential functions of the bus mechanic position even with the requested
accommodation.  Considering the facts in the light most favorable to the plaintiff as the non-
moving party, the record consists of the following regarding the plaintiff's involvement in safety-
related incidents and his use of Adderall.  In the spring of 2009, the plaintiff committed two
safety-related infractions; in both instances, he moved the bus he was servicing without first
detaching the fuel nozzle.  After the second occurrence, the plaintiff sought medical advice, and
in June of 2009, he was diagnosed with ADHD.  See Am. Compl. ¶ 16.  The plaintiff first tried
therapeutic treatment to manage the associated symptoms, id., and when deemed ineffective, the
plaintiff then began using medically prescribed Adderall, id. ¶ 17, and he reported its use to
WMATA, see Pl.'s Opp'n, ECF No. 82-1, Ex. 2 (Prescription Reporting Form dated June 26,
2009).  Thereafter, the plaintiff reported feeling "jittery" to a co-worker.  See Am. Compl. ¶ 24;

see also Pl.'s Opp'n, ECF No. 82, Ex. 1 (June 9, 2010 Email from Cooper-Lucas).  On June 9,

2010, the plaintiff was instructed to report to WMATA's medical department for testing, see id.,

ECF No. 83-8, Ex. 19 (WMATA Notice Form dated June 9, 2010), which he did the following

day.  See id., ECF No. 83-9, Ex. 20 (WMATA Medical Office Return to Duty Notice dated June

10, 2010).  While at the medical department, the plaintiff was informed by Dr. Johnson, a

WMATA medical review officer, that he could not take Adderall because of his job position

based on federal law and that he needed to change prescriptions before he would be allowed to

return to work.  See id.  The plaintiff then began taking Strattera, a non-stimulant medication

designed to treat ADHD, and was able return to work on or about June 16, 2010.  See id., ECF

No. 83-10, Ex. 21 (WMATA Medical Office Return to Duty Notice dated June 16, 2010).

Subsequently, the plaintiff was involved in two additional on-the-job accidents, the last occurring

on or about September 6, 2010.  See Defs.' Mem. at 2; see also Pl.'s Opp'n at 13.  Both accidents

were attributed by the plaintiff to being prohibited from using Adderall.  See id., ECF No. 84-16,

Ex. 51 (Accident Appeal Form dated September 18, 2010) ("Accident Appeal").

    Based on the plaintiff's further investigation of federal law and WMATA's policy on the

use of prohibited controlled substances by employees in safety-sensitive positions, he filed an

accident appeal regarding the second accident and began taking Adderall again.  See id., ECF

No. 84-16, Ex. 51 (Accident Appeal).  On January 18, 2011, the plaintiff was instructed to report

to WMATA's medical department, see id., ECF No. 82-3, Ex. 4 (Email from Jessie Joachim to

Mr. Coleman dated January 18, 2011) ("January 18, 2011 Email"), which he did the following

day.  The plaintiff was again instructed to cease using Adderall and not to return to work until he

started taking another prescription drug.  See id., ECF No. 82-7, Ex. 8 (WMATA Medical Office

Return to Duty Notice dated January 19, 2011); ECF No. 82-9, Ex. 10 (Email from Mary C.

Fleming to Copper-Lucas dated January 31, 2011) ("January 31, 2011 Email") at 3.  The plaintiff

reluctantly obliged and provided WMATA's medical department with a prescription for

Strattera.  See id., ECF No. 82-6, Ex. 7 (Prescription Form from Dr. Peter Blaes dated January

19, 2011).  On Friday, January 21, 2011, the plaintiff had a conversation with defendant Cooper-

Lucas, and he agreed not to take Adderall after the upcoming Sunday afternoon.  See Pl.'s

Opp'n, ECF No. 82-4, Ex. 5 (WMATA Medical Office Return to Duty Notice dated January 21,

2011) ("January 21, 2011 Return to Duty Notice"); ECF No. 82-5, Ex. 6 (Email from Cooper-

Lucas to John Coleman dated January 21, 2011) ("January 21 Email"); see also Defs.' Mem.,

ECF No. 78-6, Ex. B (Joint Labor Management Committee Meeting Transcript dated March 15,

2011) ("Committee Transcript") at 38.  The plaintiff was then allowed to return to duty on

January 24, 2011.  On the next day, January 25, 2011, the plaintiff sustained another on-the-job

injury.

   Based on this record, the plaintiff has produced sufficient evidence from which a

reasonable fact-finder could conclude that he could perform the essential functions of the

position of bus mechanic with the use of Adderall as a reasonable accommodation.  The record

indicates that the plaintiff was not involved in any safety-related incidents while actively using

Adderall.  In fact, the record suggests the opposite – that with the use of Adderall, the plaintiff

performed his duties devoid of any safety-related incidents, but that without the use of Adderall,

the plaintiff was accident prone due to his symptoms caused by his ADHD.  The only incident[6]

---

[6] The defendants argue that the plaintiff was provided a reasonable accommodation when he was placed in a Station Manager's position, a non-safety sensitive position, after an "April 5, 2012 incident in which [the p]laintiff left his bus running in an alley for a few hours and he told the supervisor that he 'forgot' about it."  Defs.' Mem. at 13.  This

(continued . . .)

that might suggest otherwise is the plaintiff's on-the-job injury which, as the medical review officer noted, a genuine question exists as to whether the plaintiff continued taking Adderall after being instructed not to do so, or whether his prior use of Adderall was still traceable in the plaintiff's urine when the injury occurred.  See Pl.'s Opp'n, ECF No. 84-19, Ex. 56 (WMATA Medical Review Officer Verification Worksheet dated January 31, 2011) ("January 31, 2011 Verification Worksheet").  Also, John Coleman, a supervisor in the plaintiff's chain of command, conducted an investigation "into the allegation made by [the plaintiff] that he was discriminated against on the basis of his disability and that his termination was a retaliatory act based on being denied an accommodation request for his disability" and did not find "any reference to a safety violation in [the plaintiff's] personnel folder."  Id., ECF No. 84-36, Ex. 90 (Memorandum re Amended Notification of EEOC Charge dated June 28, 2011) at 1.  Moreover, WMATA has not produced any research or medical expert evidence which indicates that the use of Adderall by employees in safety-sensitive positions compromises safety.  Other than the evidence concerning the safety-related incidents, WMATA also has failed to provide any other evidence of the plaintiff's inability to perform the essential functions of a bus mechanic. Accordingly, the Court cannot grant summary judgment on the plaintiff's disability discrimination claim for either the plaintiff or the defendants.

### b.  Retaliation Claim

The plaintiff alleges WMATA retaliated against him in violation of the Rehabilitation Act for asserting his rights under the Rehabilitation Act and for filing a charge of discrimination

---

(. . . continued)

incident and the facts surrounding it are in dispute in another case brought by the plaintiff, and therefore, are not within the Court's province, at this time, to consider in resolving the issues in the present case.

with the EEOC.  See Am. Compl. ¶¶ 193-200.  On the other hand, WMATA asserts that the

plaintiff's retaliation claim under the Rehabilitation Act fails on the merits because it had

"legitimate, non-discriminatory reasons" for its employment-related actions which "the plaintiff

cannot demonstrate . . . were pre-textual."  Defs.' Mem. at 16.

"Where, as here, a plaintiff offers only circumstantial evidence of retaliation, [his] claim

is governed by the burden-shifting framework of McDonnell-Douglass."  Solomon v. Vilsack,

763 F.3d 1, 14 (D.C. Cir. 2014) (Rehabilitation Act case).  This framework requires the plaintiff

to first establish a prima facie case of retaliation by showing that "(1) he engaged in a statutorily

protected activity; (2) [he] suffered a materially adverse action by [his] employer; and (3) a

causal connection existed between the two."  Wiley v. Glassman, 511 F.3d 151, 155 (D.C. Cir.

2007).  If the plaintiff satisfies this burden, "the burden of production shifts to the employer to

produce a 'legitimate, nondiscriminatory reason' for its action."  Solomon, 763 F.3d at 14

(quoting Wiley, 511 F.3d at 155).  If the employer provides such a reason, the plaintiff must then

counter with "sufficient evidence to 'create a genuine dispute on the ultimate issue of retaliation

either directly by [showing] that a discriminatory reason more likely motivated the employer or

indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  Id.

(quoting Pardo-Kronemann v. Donovan, 601 F.3d 599, 604 (D.C. Cir. 2010)).

Once the employer comes "forward with a legitimate, non-retaliatory justification for

[their] actions," the burden shifting framework becomes irrelevant and the court need not

determine whether the plaintiff established a prima facie case of retaliation.  Id.  Rather, the court

should proceed to the question of retaliation vel non, as that "question is the ultimate factual

issue in the case."  Id. (citations and quotations omitted).  Here, WMATA argues that safety-

related considerations for its employees and passengers were the legitimate, non-discriminatory reasons for its employment-related actions it took in regards to the plaintiff.  Defs.' Mem. at 9.

Viewing the record in the light most favorable to the plaintiff as the non-moving party, the following are the facts pertinent to the plaintiff's claim of pretext.  On September 18, 2010, the plaintiff filed an accident appeal concerning an accident that occurred on September 6, 2010, for which he contends he should not have been held responsible for because he "was unjustifiably forced to stop taking Adderall."  Pl.'s Opp'n, ECF No. 84-16, Ex. 51 (Accident Appeal).  On his appeal form, the plaintiff explained that he was told "it was against the Department of Transportation guideline[s] to have any [commercial driver license] holder use a schedule 2 medication," but after further investigation, he learned that "neither the [Department of Transportation] or WMATA have a written policy that prevents the use of a schedule 2 narcotic as long as the use is in adherence to a prescribed treatment issued by a licensed practitioner."  Id.  And he contends that his "use falls [within] this category."  Id.  The appeal form was signed and dated by the plaintiff's supervisor.  Id.  On January 18, 2011, the appeal board conducted a hearing and, in denying the appeal, determined that "the majority of the panel agreed that the accident was rated properly."  Id., ECF No. 84-18, Ex. 53 (Accident Appeal Form Panel Decision dated January 18, 2011) ("Accident Appeal Decision").

After the accident appeal hearing concluded, but on the same date, the plaintiff was instructed to report to WMATA's medical department, see id., ECF No. 82-3, Ex. 4 (January 18, 2011 Email), because he "self-disclosed to management on January 18th [that] he was using a prohibited medication."  id., ECF No. 82-9, Ex. 10 (January 31, 2011 Email).  The plaintiff reported to the medical department on January 19, 2011, and as noted earlier, he was instructed

to not use Adderall and was informed that he would not be permitted to work until he changed

prescriptions.  See id., ECF No. 82-7, Ex. 8 (WMATA Medical Office Return to Duty Notice

dated January 19, 2011); ECF No. 82-9, Ex. 10 (January 31, 2011 Email).  The next day, the

plaintiff provided WMATA's medical department with a prescription for Strattera.  See id., ECF

No. 82-6, Ex. 7 (Prescription Form from Dr. Peter Blaes dated January 19, 2011).  He spoke with

defendant Cooper-Lucas on January 21, 2011, see Defs.' Mem., ECF No. 78-6, Ex. B

(Committee Transcript) at 38, and "[r]eported [that] he would stop taking Adderall before 2pm

[on] January 23, 2011."  Pl.'s Opp'n, ECF No. 82-8, Ex. 9 (WMATA Employee Assistance

Program Substance Abuse Professional's Assessment dated February 4, 2011) ("Assessment

Intake").  Defendant Cooper-Lucas told the plaintiff that "if you are off that medication for 48

hours, you should be clean."  Defs.' Mem., ECF No. 78-6, Ex. B (Committee Transcript) at 38.

The plaintiff agreed not to further take Adderall after the designated time and was given a return

to duty notice on January 21, 2011, allowing him to return to work on January 24, 2011.  See

Pl.'s Opp'n, ECF No. 82-4, Ex. 5 (January 21, 2011 Return to Duty Notice); ECF No. 82-5, Ex.

6 (January 21 Email); see also Defs.' Mem., ECF No. 78-6, Ex. B (Committee Transcript) at 38.

However, the plaintiff also filed a Charge of Discrimination with the EEOC on January 21, 2011,

alleging disability discrimination.  See Defs.' Mem., ECF No. 78-7, Ex. Attachment 1 (Charge of

Discrimination).

On January 25, 2011, the plaintiff "experienced an on-duty injury while working on [a]

bus" and the "results of the Post Incident Medical Examination" conducted later that night "were

positive for amphetamines [,which purportedly] . . . place[d the plaintiff] in violation of the

Authority's Policy on Substance Abuse."  Pl.'s Opp'n, ECF No. 83-13, Ex. 24 (WMATA

Investigation Report dated February 3, 2011).  But, although the plaintiff's urinalysis tested

positive for amphetamines, his urinalysis was ruled negative by a medical review officer, see id.,

ECF No. 83, Ex. 11 (Designated Employer Representative/Designee Non-Negative Worksheet

dated January 1, 2011); ECF No. 84-19, Ex. 56 (January 31, 2011 Verification Worksheet),

because the plaintiff had a legitimate medical explanation, see id., ECF No. 83-3, Ex. 14

(Medical Review Officers and the Verification Process).  Nonetheless, it was determined that the

plaintiff violated WMATA's prescription reporting policy, see id., ECF No. 83-4, Ex. 15

(Memorandum re Administrative Action dated February 3, 2011) ("February 3, 2011 Mem."),

which provides that "[f]ailure to report prescription medication . . . , the presence of which may

be detected by a urinalysis test . . . , shall constitute a positive test result," id., ECF No. 84-7, Ex.

36 (WMATA Policy/Instruction).  Also, WMATA's Substance Abuse policy states, "[u]nder

appropriate circumstances, in cases where the employee was disciplined . . . for any drug

presence for which the employee had a legitimate, but unreported prescription, the Medical

Director may establish a minimum [Employee Assistance Program] duration of 30 days."  Id.,

ECF No. 84-4. Ex. 33 (WMATA Substance Abuse Policy and Employee Assistance Program).

Consequently, the plaintiff was "(1) immediately released from pay status . . . (2) given ten days

to enroll in the [Employee Assistance Program] as a Category II participant [and] (3) upon

enrollment . . . remain in release from pay status for the . . . minimum 30 days, [and told that] (4)

failure to enroll [or] satisfactorily complete the EAP participation requirements will result in

[his] discharge."  Id., ECF No. 83-4, Ex. 15 (February 3, 2011 Mem.).

On February 24, 2011, while submitting to surveillance testing, the plaintiff informed his

Employee Assistance Program counselor about a "new prescription for Adderall."  Id., ECF No.

84-22, Ex. 61 (Individual Contact Record dated February 24, 2011) ("Individual Contact Record").  The parties, however, dispute whether the plaintiff asked if he could take the prescription while he was not working due to the suspension, see generally Defs.' Mem., ECF No. 78-6, Ex. B (Committee Transcript), or if he indicated that he intended to take Adderall, see Pl.'s Opp'n, ECF No. 84-22, Ex. 61 (Individual Contact Record).  In any event, on February 28, 2011, the plaintiff received a notice that "it was determined that [he has] been non-compliant" with his Employee Assistance Program contract and was "referred to the Joint Labor Management Committee [("Committee")] for case review."  Id., ECF No. 84-21, Ex. 60 (Letter from Cooper-Lucas dated February 28, 2011).  Based on the information provided at a subsequent hearing, the Committee referred the plaintiff for administrative action and voted to terminate the plaintiff's employment.  See Defs.' Mem., ECF No. 78-6, Ex. B (Committee Transcript) at 72.

Based on this record, the plaintiff has produced sufficient evidence from which a reasonable juror could conclude that WMATA's proffer of safety-related considerations were pretextual and that WMATA was likely motivated more by retaliation against the plaintiff.  First, the appeal board's decision form provided commentary that gives the Court some pause for several reasons:  (1) the board was composed of three individuals, one being Mr. Coleman, who was one of the supervisors in the plaintiff's chain of command and who had been the subject of grievances filed by the plaintiff, see Pl.'s Opp'n, ECF No. 84-50, Ex. 113 (Statement for Grievance Filing) at 1; (2) the plaintiff "appealed [with] no explanation," even though he filed a detailed explanation signed by his immediate supervisor, wherein he asserted that he was unjustifiably forced to stop taking Adderall given his understanding that federal law permits the

use of Adderall pursuant to treatment prescribed by a licensed practitioner, and while WMATA

did not have a policy prohibiting the use of Adderall; and (3) even though the plaintiff was

present during the hearing, the union's shop steward signed the form on the plaintiff's behalf,

suggesting that the plaintiff was not afforded an opportunity to review or even contest the

information provided on the decision form.  Id., ECF No. 84-18, Ex. 53 (Accident Appeal

Decision).  Also, even though the plaintiff submitted multiple prescription reporting forms to

WMATA for his use of Adderall after filing his accident appeal, see id., ECF No. 84-46, Ex. 106

(Prescription Reporting Form dated October 9, 2010); ECF No. 84-47, Ex. 110 (Prescription

Reporting Form dated November 10, 2010); ECF No. 84-48, Ex. 111 (Prescription Reporting

Form dated December 10, 2010), it was not until immediately after the appeal hearing, when

WMATA learned that the plaintiff resumed taking Adderall, that the plaintiff was instructed to

report to the medical department where he was again directed to cease taking Adderall and

change prescriptions if he desired to return to work.  After agreeing not to further take Adderall

and to switch back to Strattera, the plaintiff returned to work and had an on-the-job injury.  The

post-incident test results were positive for amphetamines (Adderall) but were ruled negative by

the medical review office because the plaintiff had a prescription for its use.  Nonetheless, the

plaintiff was cited for violating WMATA's prescription reporting policy for failure to report his

prescription for Adderall and was immediately reprimanded.  The Court finds this basis for

disciplining the plaintiff concerning, given that the record indicates, and as the Court noted

above, the plaintiff submitted prescription reporting forms for his use of Adderall to WMATA on

October 9, 2010, see id., ECF No. 84-46, Ex. 106 (Prescription Reporting Form), on November

10, 2010, see id., ECF No. 84-47, Ex. 110 (Prescription Reporting Form), on December 10,

2010, see id., ECF No. 84-48, Ex. 111 (Prescription Reporting Form), and on January 11, 2011,

see id., ECF No. 83-11, Ex. 22 (Prescription Reporting Form).

Furthermore, the plaintiff was terminated because he was purportedly non-compliant with

the terms of his Employee Assistance Program contract due to his alleged representation during a

surveillance testing that he was going to resume taking Adderall.  As previously noted, the

parties dispute this fact, but even so, the Employee Assistance Program contract does not

indicate that it is a violation to inquire about or suggest the intended use of a prescribed

medication; the contract only provides that the participant is required "to inform the [Employee

Assistance Program] Office and treatment program (before testing) of all drugs being taken,

including those prescribed by a licensed physician . . . [and] to abstain from alcohol or illegal

drugs during [his] [Employee Assistance Program] participation."  Id., ECF No. 84-24, Ex. 65

(WMATA Employee Assistance Program Participation Requirements).  Nevertheless, the

plaintiff was referred to the Joint Labor Management Committee for non-compliance.

The Court also finds the transcript from the Committee's hearing problematic in multiple

respects.  Primarily, the Committee was chaired by defendant Cooper-Lucas, who had a tenuous

working relationship with the plaintiff, see generally Defs.' Mem., ECF No. 78-6, Ex. B

(Committee Transcript) at 38-39, and who prior to the plaintiff entering the room, made it clear

to the Committee that the use of Adderall was prohibited by federal regulations, see id. at 43, that

the plaintiff had never submitted any prescription reporting forms for his use of Adderall in

accordance with WMATA's policy, id. at 43-44, and that the plaintiff's "behavior suggests that

he's addicted to [Adderall,]" id. at 39.  The transcript also contains numerous factual

inaccuracies and discrepancies, see id. at 44 (identifying Adderall as a type of Benzodiazepines),

see also id. at 38 (misstating the timing of when certain safety incidents occurred in relation to plaintiff's use of Adderall), that may have clouded the judgment of the Committee members and contributed to the Committee concluding that administrative action, and specifically termination, was warranted, see id. at 70.  The transcript also shows that the plaintiff was constantly interrupted and never given an adequate opportunity to defend himself or present evidence to support his arguments and actions.  See id. at 45-56, 70.

Moreover, WMATA has not credibly identified any safety-related incident to support its proffer of safety-related considerations as their legitimate, non-discriminatory reasons for the actions it took.  As discussed above, the only incident it relies upon is the plaintiff's on-the-job injury that occurred two days after the plaintiff informed WMATA that he would cease taking Adderall.  But, as the medical review officer noted, there is a genuine question as to whether the plaintiff continued taking Adderall or whether the Adderall was still traceable in the plaintiff's urine from prior usage.  See Pl.'s Opp'n, ECF No. 84-19, Ex. 56 (January 31, 2011 Verification Worksheet).  Consequently, in light of the considerable evidence produced by the plaintiff, the Court finds that a reasonable fact-finder could conclude that the defendant's proffer of safety-related considerations for its employment-related actions it took against the plaintiff was pretextual and that the defendant's actions were more likely motivated by retaliation.  However, the plaintiff's claim for summary judgment is also precluded because there exists a genuine question as to whether the plaintiff's use of Adderall raised legitimate safety concerns.  Accordingly, the Court declines to grant the plaintiff or the defendants summary judgment on the plaintiff's retaliation claim.

**C.      The Plaintiff's Defamation Claim against the Individual Defendants**

The individual defendants request summary judgment on the plaintiff's common law

defamation claim on the grounds that it is time-barred; that they are immune from the claim

pursuant to the WMATA Compact; and that it fails on the merits.  <u>See</u> Defs.' Mem. at 16-23;

Defs.' Reply at 3-6.  The Court will address each argument in turn.

**1.      Timeliness**

Under District of Columbia law, "[a] claim for defamation must be filed within one year

of accrual of the cause of action."  <u>Maupin v. Haylock</u>, 931 A.2d 1039, 1041-42 (D.C. 2007);

D.C. CODE § 12-301(4) (2012).  Akin to the parties' submissions at the motion to dismiss stage,

they acknowledge that this is the applicable limitations period for the plaintiff's defamation

claim, but continue to dispute when the claim accrued.  The individual defendants assert that the

claim accrued in March 2011 when the plaintiff became aware of the alleged defamatory

statements the individual defendants made at the Committee hearing, and that the claim is

therefore time-barred because the plaintiff filed this case more than a year later in June 2012.

Defs.' Mem. at 22.  The plaintiff responds that he did not learn of the alleged defamatory

statements "prior to being given the [Committee hearing] transcripts" on or about July 5, 2011,

and that this should be the accrual date for his defamation claim, thus making his claim timely.

Pl.'s Opp'n at 38.

"As a general rule, '[w]here the fact of an injury can be readily determined, a claim

accrues for purposes of the statute of limitations at the time the injury actually occurs.'"  <u>Mullin</u>

<u>v. Wash. Free Weekly, Inc.</u>, 785 A.2d 296, 298 (D.C. 2001) (citation omitted).  Consistent with

this rule, a defamation claim typically accrues, "and the one-year limitations period beg[ins] to

run, at the time the allegedly defamatory statement [is] published." Maupin, 931 A.2d at 1042.

"But when 'the relationship between the fact of injury and the alleged tortious conduct [is]

obscure,'" the District of Columbia Court of Appeals has applied what is known as the

"discovery rule," which provides that "the statute of limitations will not run until plaintiffs know

or reasonably should have known that they suffered injury due to the defendants' wrongdoing."

Mullin, 785 A.2d at 298-99 (citation omitted).  And, as the Court previously outlined, the

discovery rule may be applied to defamation claims other than those of the mass media context.

See McFadden, 949 F. Supp. 2d at 221-22 (discussing a federal court's mandate to resolve an

issue of undecided state law according to the rule it believes the "state's highest court is likely to

adopt in the not too distant future" and holding that the District of Columbia Court of Appeals

would apply the discovery rule based on the facts of this case) (citations omitted).  Under the

discovery rule, the plaintiff need "not know the precise content of [the alleged defamatory]

statements[, so long as] he had sufficient knowledge that an allegedly defamatory statement was

made, of its publication . . . and of some injury resulting from the statements."  Stith v.

Chadbourne & Parke, LLP, 160 F. Supp. 2d 1, 7 (D.D.C. 2001) (citing Wallace v. Skadden,

Arps, Slate, Meagher & Flom, 715 A.2d 873, 882-83 (D.C. 1998) ("In National Railroad

Passenger Corporation v. Krouse, 627 A.2d 489, 497-98 (D.C. 1993), we held that once the

plaintiff has been placed on notice of an injury and of the role of the defendants' wrongful

conduct in causing it, the policy disfavoring stale claims makes application of the [discovery

rule] inappropriate.")).

Here, granting the individual defendants summary judgment on the grounds that the

statute of limitations bars the plaintiff's defamation claim is precluded because there is at least a

genuine dispute of material fact as to <u>when</u> the plaintiff knew or should have known that the individual defendants' alleged defamatory statements caused his purported injury.  The individual defendants argue that the defamation claim is time-barred based on the following:  (1) in the plaintiff's March 18, 2011 email to Local 689 official J. Madaras, the plaintiff's union representative, he complained about Mr. Madaras' actions and representation provided during the Committee hearing, and also "referred to [defendant] Cooper-Lucas' '[c]laim that [he] never turned in prescription [sic] despite filing a grievance and an accident appeal" and stated "I don't [believe] fighting for my rights displays addiction," <u>see</u> Defs.' Mem. at 22 (citations omitted); (2) the plaintiff's allegation that he was "attacked in the [Committee hearing] for being addicted[,]" <u>id.</u> (citing the Am. Compl. ¶ 62); and (3) the plaintiff's subsequent meeting with Mr. Madaras, when Mr. Madaras told the plaintiff that "his action[s] were predicated on information that he was given prior to [the] Plaintiff entering the room," <u>id.</u> at 23 citing (Am. Compl. ¶ 131). According to the individual defendants, these statements show that the plaintiff was aware and knew of the nature of the alleged defamatory statements for more than a year before he filed his complaint.  <u>Id.</u> at 22-23.

For the following reasons, the Court is not persuaded from these facts that the plaintiff was put on notice of an injury and of the role of the individual defendants' purported wrongful conduct in causing it.  First, the plaintiff's statements in his March 18, 2011 email to Mr. Madaras and his allegation of being attacked for being an addict during the Committee hearing, were conceivably direct responses to Mr. Madaras' question during the Committee hearing, wherein he asked the plaintiff "don't you think you are addicted to [Adderall]?"  <u>See</u> Defs.' Mem., ECF No. 78-6, Ex. B (Committee Transcript) at 65-66.  In light of this line of questioning

from the Committee, it is plausible that the plaintiff did not have knowledge of the individual

defendants' allegedly defamatory statements.  Second, defendant Cooper-Lucas' statement to the

plaintiff during the Committee hearing that, "if you've got proof that you've submitted any

prescription reporting forms, please produce that[,]" id. at 60, plausibly suggested only that it

was her belief that the plaintiff had not submitted any prescription reporting forms.  Finally, Mr.

Madaras' statement during his subsequent meeting with the plaintiff does not suggest that he

alerted the plaintiff as to the nature of the allegedly defamatory statements, but merely explains

the basis for his actions taken during the meeting.  None of these facts indicate that the plaintiff

had sufficient knowledge of the allegedly defamatory statements until he received a copy of the

Committee hearing transcripts on or about July 5, 2011.  Accordingly, the Court declines to grant

the defendants' motion for summary judgment on the grounds that the plaintiff's defamation

claim was untimely filed.

### 2.      Immunity under the WMATA Compact

The individual defendants next argue that they are immune from the plaintiff's

defamation claim pursuant to the interstate compact creating WMATA.  Defs.' Mem. at 4.

"Section 80 of the Compact waives [WMATA's sovereign] immunity for torts 'committed in the

conduct of any proprietary function,' while retaining immunity for torts committed by its agents

'in the performance of a governmental function.'"  Beebe v. Wash. Metro. Area Transit Auth.,

129 F.3d 1283, 1287 (D.C. Cir. 1997) (quoting D.C. CODE ANN. § 1-2431(80) (2010)).  Section

80 of the WMATA Compact also "provides that the 'exclusive remedy' for any action for which

WMATA is liable 'shall be by suit against the Authority'"; thus, "for torts committed in the

course of proprietary or ministerial functions, WMATA is liable and its employees immune."  Id.

at 1288 (quoting D.C. Code § 1-2431(80)).  Further refining this rule, the District of Columbia

Circuit in <u>Beebe</u> held that WMATA employees "enjoy absolute immunity from state-law tort

actions when the conduct at issue falls 'within the scope of their official duties and the conduct is

discretionary in nature.'"  <u>Id.</u> at 1289 (quoting <u>Westfall v. Erwin</u>, 484 U.S. 292, 297-98 (1988)).

"[T]he burden of establishing immunity [is] on the official."  <u>Id.</u> (citing <u>Westfall</u>, 484 U.S. at

299).

The plaintiff contends that the individual defendants[7] acted beyond the outer limits of

their official duties when they made certain defamatory statements about him before he entered

the room for the Committee hearing.  Pl's Opp'n at 25-32; <u>see also</u> Am. Compl. ¶¶ 201-02 (e.g.,

alleged statements that: "Plaintiff abused Adderall; his actions suggested that he was addicted to

Adderall; Plaintiff was aggressive and violent in his EAP hearing; Plaintiff failed a company

drug test; Plaintiff never reported his prescription for Adderall to WMATA at any time").  The

plaintiff also argues that the individual defendants' determinations were not discretionary but

"were malicious and salacious attacks" on him.  Pl's Opp'n at 31.  The individual defendants

respond that because of "WMATA's safety interests in monitoring employees, like [the

p]laintiff, who were in a safety sensitive position," it was not only within their official duties "to

make determinations regarding whether an employee's use of a medication was in accordance

with WMATA and/or DOT requirements," but that they also "had the right—indeed the duty—to

communicate with each other regarding an employee's use of prescription medication."  Defs.'

---

[7] The plaintiff does not allege any specific defamatory statements made by defendant John Coleman; he alleges only that Mr. Coleman "made, repeated, and wrote disparaging statements about [him] when he terminated [him]."  Am. Compl. ¶ 203.  Without specifically pleading what Mr. Coleman allegedly said, the Court is unable to assess whether defendant Coleman's statements were made within the scope of his official duties and the level of discretion he used when making those statements.  Therefore, because the plaintiff does not specifically identify the statements made by defendant Coleman that were allegedly defamatory, defendant Coleman is entitled to summary judgment.

Mem. at 21.  Moreover, they contend that their determinations "were discretionary in nature [because they] reflected their professional assessment of [the p]laintiff's situation," id., while attempting to "comply with federal standards and WMATA practice."  Defs.' Reply at 9.

To support their position, the individual defendants rely on the court's discussion in Beebe, where the court upheld the dismissal of the plaintiff's defamation claim based on its finding that the plaintiff's contention that the challenged statements were motivated by personal animus, was "conclusory," and because the plaintiff "failed to allege [that his supervisor] acted outside the scope of [his] official duties."  Beebe, 129 F.3d at 1289.  Moreover, the court found that the plaintiff's supervisor's actions were discretionary "as they involved a large measure of choice."  Id.  However, the court noted that

> not all intentional or malicious torts committed in the normal course of employment necessarily fall within the scope of official duties.  Officials exceed the outer perimeters of their responsibilities, and act manifestly beyond their line of duty, for example when they resort to physical force to compel the obedience of their managerial subordinates . . . or when they use false threats of criminal charges to coerce an employee into resigning.

Id. (citations omitted).

The individual defendants also assert that the Fourth Circuit's decision in Martin v. Wood, 772 F.3d 192 (4th Cir. 2014) supports their position.  Defs.' Reply at 10.  In that case, the plaintiff alleged that her employer failed to compensate here for overtime hours she worked because her supervisors, who were the only defendants in the case, refused to authorize such compensation.  See Martin, 772 F.3d at 196.  Since the plaintiff did not allege that her supervisors "acted in an ultra vires manner or attempted to serve personal interests distinct from the [employer's] interests," the Fourth Circuit reversed the district court's ruling denying the supervisors' dismissal motion based on sovereign immunity because "virtually every factor

indicates that [the supervisors were] being sued in their official capabilities" and the supervisors' actions were "inextricably tied" to their official duties." Id.

The Court is not persuaded that the reasoning in Martin is applicable to this case.  In Martin, the plaintiff's complaint included only allegations that her supervisors "acted directly and indirectly in the interest of [the employer]," but without any allegations of a personal animus, the court found that the Commonwealth of Virginia was the "real party in interest" that the plaintiff was seeking to hold accountable.  See id.  ("In these circumstances, we hold that Virginia is the real party in interest, and that sovereign immunity—grounded in the Eleventh Amendment—requires dismissal of the suit." (citations omitted)).  Here, the plaintiff alleges that the individual defendants acted in a malicious or ultra vires manner outside their official capacities when they allegedly made defamatory statements against him.  Nonetheless, the Court finds the Circuit's holding in Beebe applicable and similarly concludes that the individual defendants are entitled to sovereign immunity because they made the allegedly defamatory statements while acting within the scope of their official duties and because their determinations about the plaintiff's actions and his use of Adderall were discretionary in nature.

Defendant Cooper-Lucas, when the allegedly defamatory statements were made, was the Manager of the Medical Services and Compliance Branch, and in that capacity, was responsible for ensuring that WMATA and its employees were in "compliance with Federal law" and, to achieve this end, "manage[d], direct[ed], and evaluate[d] [WMATA's] medical services branch and administers all [WMATA] medical, employee assistance and compliance operations programs."  Pl.'s Opp'n, ECF No. 84, Ex. 27 (WMATA Job Description for Manager of Medical Services).  Because the Joint Labor Management Committee is an integral part of WMATA's

36

employee assistance and compliance programs, defendant Cooper-Lucas, as the Manager, would be expected to participate in the Committee process.  In addition, defendant Ron Kelly is an Employee Assistance Counselor who was tasked with "providing clinical services including assessment, referral, [and] case management . . . for all employees referred to the [Employee Assistance Program,]" as well as "prepar[ing] [a] chronology of events as needed for the [Committee] on employees who request a review of their case before the [C]ommittee." Id., ECF No. 84-8, Ex. 38 (WMATA Job Description for Employee Assistance Counselor). Defendant Kelly was the plaintiff's assigned Employee Assistance Program counselor and worked directly with the plaintiff throughout the plaintiff's participation in the program. See id., ECF No. 82-8, Assessment Intake.  Undoubtedly, because of his role as the assigned Employee Assistance Program counselor, defendant Kelly would have first-hand knowledge of the plaintiff's actions during his participation in the employee assistance program that would be critical to the Committee's fact-finding and evaluation of the plaintiff's compliance with the program. See id.  Also, defendant Cooper-Lucas was closely involved in WMATA's medical department's assessment of the plaintiff's use of Adderall, see Defs.' Mem, ECF No. 78-6, Ex. A (March 30, 2011 Mem.), and would therefore have critical background information about the plaintiff prior to his enrollment in the Employee Assistance Program that would aid in the Committee's decision-making process.  Thus, participation by both defendants Cooper-Lucas and Kelly at the Committee hearing was within their official duties as defendant Cooper-Lucas was required to coordinate the Committee process and defendant Kelly, as the counselor who assessed the plaintiff, was required to provide the Committee with the essential facts about the plaintiff's performance in the Employee Assistance Program.

Furthermore, when making the allegedly defamatory statements, the individual defendants' were exercising discretion integral to WMATA's obligation of ensuring that its employees in safety-sensitive positions comply with federal regulations governing the use of prohibited controlled substances for the benefit of not only its passengers but also its employees. Although the individual defendants were not entirely accurate on the state of the law when they made their statements, they only provided the Committee with determinations based on their training, education, prior experiences, and assessment of the plaintiff's medical history. In fact, the individual defendants were careful to include language that qualified their professional assessment, which undermines the plaintiff's position that their opinions were made with malice. See Defs.' Mem., ECF No. 78-6, Ex. B (Committee Transcript) at 39 (the plaintiff's "behavior suggests that he[] [is] addicted to [Adderall] . . . if [he] take[s] excessive amounts of it, which I don't know that he has, but his physical presentation oftentimes gives the appearance of jittery shaking, he's very aggressive in his stance and demeanor."). Safety being a fundamental obligation a mass transit authority like WMATA owes to both its customers and employees, employees in positions similar to those of the individual defendants demand candid commentary on an employee's use of prescribed medication, particularly when a question arises concerning whether use of the medication endangers safety.

Because the individual defendants were acting within the scope of their official duties when their statements were made and their determinations were discretionary in nature, their statements about the plaintiff are protected by sovereign immunity. Accordingly, the Court grants the defendants' motion for summary judgment of the plaintiff's defamation claim lodged

against the individual defendants, rendering it unnecessary to address the merits of the plaintiff's

defamation claim.

**D.**     **The Plaintiff's Civil Conspiracy Claim**

The defendants next argue that the Circuit's holding in <u>Nader v. Democratic National</u>

<u>Committee</u>, 567 F.3d 692, 697 (D.C. Cir. 2009) requires the granting of summary judgment on

the plaintiff's civil conspiracy claim.  Defs.' Mem. at 23.  The defendants are correct, and

accordingly, the plaintiff's civil conspiracy claim must be dismissed.

As the Court earlier explained, in the District of Columbia, "[c]ivil conspiracy is not an

independent tort but only a means for establishing vicarious liability for an underlying tort."

<u>Nader</u>, 567 F.3d at 697 (quoting <u>Hill v. Medlantic Health Care Grp.</u>, 933 A.2d 314, 334 (D.C.

2007) (internal quotation marks omitted); <u>see also</u> Order at 7 (Apr. 14, 2011), ECF No. 38.

Therefore, a claim of civil conspiracy fails unless the elements of the underlying tort are

satisfied.  <u>Nader</u>, 567 F.3d at 697 (citing <u>Exec. Sandwich Shoppe, Inc. v. Carr Realty Corp.</u>, 749

A.2d 724, 738 (D.C. 2000)).  "Indeed, because its only purpose is to spread liability for a

successful tort claim to all agreeing parties regardless of whether they actually committed the

tortious act, a civil conspiracy claim incorporates not only every substantive elements of the

underlying tort, but also its statute of limitations."  <u>Id.</u> (citing <u>Diamond v. Davis</u>, 680 A.2d 364,

366 n.4 (D.C. 1996)).  Here, sovereign immunity precludes the plaintiff's defamation claim,

which is the underlying tortious act serving as the predicate for the plaintiff's civil conspiracy

claim.  <u>See</u> <u>Banneker Ventures, LLC v. Graham</u>, 798 F.3d 1119, 1145 (D.C. Cir. 2015)

(remanding the proceedings back to the district court to "evaluate whether the actions that it

concludes would not be immunized, taken together, state a claim against [the individual

defendant] for tortious interference or civil conspiracy."); see also Smalls v. Emanuel, 840 F.

Supp. 2d 23, 34-36 (D.D.C. 2012) (holding that the plaintiff's civil conspiracy claim fails

because all of the underlying torts failed, including the plaintiff's defamation claim which

sovereign immunity precluded).  Consequently, the plaintiff's civil conspiracy claim cannot

survive either.  Accordingly, the Court grants defendants' motion for summary judgment of the

plaintiff's civil conspiracy claim.

## IV.  CONCLUSION

For the foregoing reasons, the plaintiff's motions to strike and for sanctions are denied.

The plaintiff's cross-motion for summary judgment is also denied.  On the other hand, the

defendants' motion for summary judgment is granted in part and denied in part.  Specifically, the

motion is granted insofar as the plaintiff's defamation claim against the individual defendants is

dismissed with prejudice and the plaintiff's civil conspiracy claim against the individual

defendants is also dismissed with prejudice.  However, the motion is denied in all other respects.

**SO ORDERED** this 2nd day of September, 2016.[8]

REGGIE B. WALTON
United States District Judge

---

[8] The Court will contemporaneously issue an Order consistent with this Memorandum Opinion.